## ASHBY & GEDDES

ATTORNEYS AND COUNSELLORS AT LAW

500 DELAWARE AVENUE

P. O. BOX 1150

WILMINGTON, DELAWARE 19899

TELEPHONE
302-654-1888

FACSIMILE
302-654-2067

July 7, 2016

The Honorable Christopher J. Burke
United States District Court
844 North King Street
Wilmington, Delaware 19801

VIA ELECTRONIC FILING
and HAND DELIVERY

> Re: *Medigus Ltd. v. Endochoice, Inc.,*
> C.A. No. 15-505-LPS-CJB

Dear Judge Burke:

Plaintiff Medigus, Ltd. ("Medigus") respectfully seeks an Order from the Court compelling
defendant EndoChoice, Inc. ("EndoChoice") to produce two physical samples of each version of
the Accused Product endoscopes that have non-trivial differences, responsive to Plaintiff's
Request for Production Nos. 3 and 4, with EndoChoice bearing the cost of production.

**Case Background**

The central matter before the Court is this case is the infringement of the patent-in-suit ("the '871
Patent") by Endochoice's FUSE endoscopy system, which are the Accused Products in this
matter. By way of background, the '871 Patent claims a multiple-view, articulating endoscope
that can be used in a variety of endoscopic applications.[1] The primary use of the EndoChoice
FUSE endoscope is diagnostic tool, for example, performing colonoscopies and looking for
polyps. EndoChoice sells three "flavors" of its FUSE endoscope: a gastroscope (with 2 cameras),
a colonoscope (with 3 cameras), and a "slim" colonoscope (the colonoscope with a smaller
diameter). The FUSE endoscopes, which are restricted medical devices, cannot be purchased by
the public.

Medigus also manufactures and sells an endoscope under the name MUSE. The Medigus MUSE
is a surgical tool, used to perform fundoplications (reinforcing the sphincter between the
esophagus and stomach) in the treatment of gastroesophageal reflux disease (GERD).
The Medigus MUSE noticeably does not practice the '871 Patent, as the MUSE only contains a
single camera. The MUSE also does not compete with the current Accused Products, as the
Accused Products contain no surgical functionality.

---

[1] This description of the '871 Patent is included only to provide, at a high level, context for the
issues raised in this discovery dispute, and is not intended to construe or otherwise define the
scope of the claims in the '871 Patent.

The Honorable Christopher J. Burke
July 7, 2016
Page 2 of 4

**<u>Medigus' Requests for Production and Attempts to Resolve the Dispute</u>**
In September 2015, Medigus served its First Requests for Production on EndoChoice.  Request
No. 3 requested "[f]ive working samples of each version of the each Accused Product." Ex. A
(Medigus Ltd.'s First Requests for Production to EndoChoice, Inc.) at p. 5. Request No. 4
requested "[f]ive sets of unassembled components of each version of each Accused Product." *Id.*
The Accused Products are "all products accused of infringement, including, but not limited to, all
versions and iterations of the FUSE Full Spectrum Endoscopy System." *Id.* at p.2.

EndoChoice did not provide a substantive response to either Request No. 3 or Request No. 4.
Instead, EndoChoice stated that it was "willing to meet and confer with Medigus to discuss
reciprocal production." Ex. B (EndoChoice, Inc.'s Objections and Responses to Medigus, Ltd.'s
First Requests for Production) at pp. 7-8. EndoChoice has been well-aware that the Medigus
MUSE endoscope does not practice the '871 Patent and does not compete with the Accused
Products, and thus EndoChoice's demand of MUSE product samples is not justified. *See* Ex. C
(Email of March 16, 2016, from M. Marion to C. Brown-Marshall).

Medigus first attempted to resolve the dispute with EndoChoice over the Medigus product to
satisfy EndoChoice's conditional demand. Medigus' product was discussed during the meet-and-
confer between the parties held on January 27, 2016. EndoChoice stated the MUSE device was
relevant to "its assessment of the availability and acceptability of non-infringing alternatives."
Ex. D (Email of January 28, 2016, from C. Brown-Marshall to A. Goel). Medigus provided
controlling case law demonstrating the MUSE device was not a non-infringing alternative, as it
would not be "acceptable to all purchasers of the infringing product." Ex. E (Email of February
19, 2016, from M. Marion to C. Brown-Marshall), citing *Am. Seating Co. v. USSC Group, Inc.*,
514 F.3d 1262, 1270 (Fed. Cir. 2008). Still, EndoChoice did not change its position.

The production of physical samples was discussed again on the March 10, 2016, meet-and-
confer between the parties (*see* Ex. C), and then a third time on the April 25, 2016, meet-and-
confer. Ex. F (Email of May 9, 2016, from M. Marion to C. Brown-Marshall). To resolve the
dispute, Medigus agreed to produce samples of the MUSE product, seemingly removing
EndoChoice's condition for production of the Accused Products. *Id.*  Medigus also agreed to
limiting production to only two of each of the Accused Products instead of five samples of each
assembled and unassembled Accused Product.[2]

Instead of agreeing to produce the physical samples for each version or iteration of the Accused
Product, EndoChoice only offered to provide samples of one FUSE endoscope. Ex. G (Email of
May 11, 2016, from C. Brown-Marshall to M. Marion). Medigus reiterated that the request was
for production of two samples from each generation or version of the FUSE. *Id.* (Email of May
12, 2016, from M. Marion to C. Brown-Marshall).

---

[2] This too was a compromise by Medigus, which had agreed to seek only one working model of
the Accused Products and one set of unassembled components of the Accused Products.
However, based on EndoChoice's representation that it does not have possession of the
unassembled components, Medigus agreed to production of two of each Accused Product, and
Medigus would disassemble one of each of the products itself.

The Honorable Christopher J. Burke
July 7, 2016
Page 3 of 4

The parties held a meet-and-confer with Delaware counsel on May 13, 2016, whereby EndoChoice still did not agree to production of physical samples of each of the Accused Products. After four meet-and-confers on this same issue, EndoChoice stated, for the first time, that "[o]ur present understanding is that twenty five (25) different versions of EndoChoice's endoscopes have been commercially released in the United States" and demanded payment of the purported retail price of $35,000 per endoscope. Ex. H (Email of May 24, 2016, from C. Brown-Marshall to M. Marion). This would yield a payment of $1.75 million.

As of the date of this letter, EndoChoice has neither produced any samples of any of its FUSE products to Medigus, nor made any FUSE product samples available for inspection. EndoChoice has also not stated how many of the stated 25 versions of the FUSE endoscopes contain non-trivial changers or how many are in EndoChoice's possession, custody, or control. *See id.* Medigus seeks production of this basic discovery from EndoChoice.

**Medigus' Requests for Physical Samples of the Accused Products**
Medigus is entitled to discovery from EndoChoice that is relevant to its claim of patent infringement. *See* Fed. R. Civ. P. 26(b)(1). Discovery of the accused product would be the quintessential discovery request in a claim for patent infringement, particularly where the patent-at-issue claims a tangible, mechanical device that can be visually inspected and analyzed. EndoChoice has not disputed the relevance of the physical samples during any of the meets-and-confers, or that there is any balancing to consider under Rule 26(b)(1). Moreover, EndoChoice is not resisting the production of the physical samples based on any objection it raised in its written responses to Medigus' Requests. Ex. B at pp. 7-8.

Instead, EndoChoice is demanding that the costs of production are shifted to Medigus for production of the Accused Products before production of the physical samples.[3] Medigus presents three reasons why the Court should follow the presumption that each party bears its own discovery costs. *See Onan Corp. v. GLT Industries*, No. 87 C 5592, 1988 U.S. Dist. LEXIS 203 (N.D. Ill. Jan. 8, 1988) (citing *Hurtando v. United States*, 410 U.S. 578 (1973)) (summarizing that parties bear their own discovery costs as parties can control "the scope of litigation and discovery").

*First*, EndoChoice waived its ability to seek cost shifting by failing to timely raise the issue. EndoChoice waited until all other issues concerning production of the physical samples were resolved and then raised new issues to avoid production. Waiting until after four meet-and-confers between the parties on this issue before raising this issue for the first time demonstrates a lack a justification for needing to shift costs. EndoChoice had ample opportunity to raise the issue, and demand for payment of the samples can be seen as a pretext to avoiding its discovery obligations.

---

[3] EndoChoice provided no explanation as to why it could not produce the Accused Products and resolve the cost issue later.

{01127698;v1 }

The Honorable Christopher J. Burke
July 7, 2016
Page 4 of 4

*Second,* the agreement by both parties to produce physical samples of their own products obviates the need for cost shifting. Medigus did not request payment for production of its own products, and is not presently seeking reimbursement from EndoChoice for production of the MUSE products. To require Medigus to produce its own product at its own expense, and then require purchasing the Accused Products from EndoChoice, unfairly and unjustifiably shifts the costs of discovery onto Medigus. This discovery is already proportional and the burden bilateral.

*Third*, the justification for cost-shifting for production of Accused Products does not apply in the present case. EndoChoice's representation of 25 different versions of the Accused Products (*see* Ex. H) obscures the fact that each of the versions is simply an update of a prior version of the same product. In other words, EndoChoice is only presently selling one version of its Accused Products, and the remaining 24 versions are no longer available for sale.

The Northern District of California found that cost-shifting for production of physical samples was warranted to avoid the accused infringer from "being deprived of its profit" from each of the accused products. *Caliper Techs. Corp. v. Molecular Devices Corp.*, 213 F.R.D. 555, 558 (N.D. Cal. 2003) (cited by *Invensas Corp. v. Renesas Elecs. Corp.*, 287 F.R.D. 273, 287 (D. Del. 2012)). However, in the present case, EndoChoice cannot claim a "lost profit" for endoscopes it no longer sells on the market.  EndoChoice is attempting to have Medigus purchase nearly $1.75 million purported worth of FUSE endoscopes that EndoChoice cannot sell to anyone else.

Additionally, EndoChoice has yet to identify how many endoscope versions it has in its possession, custody, or control. Ex. H. Lastly, EndoChoice provides no justification for demanding the full retail price of the endoscopes rather than the cost of the endoscope itself. *See Invensas Corp.,* 87 F.R.D. at 287. EndoChoice has failed to substantiate its claim to require cost shifting for production of the physical samples.

For all of the above reasons, Medigus respectfully requests that the Court order EndoChoice to produce two physical samples of each version of the Accused Product endoscopes that have non-trivial differences, responsive to Plaintiff's Request for Production Nos. 3 and 4, with EndoChoice bearing the cost of production.

Respectfully,

*/s/ John G. Day*

John G. Day (#2403)

JGD/nml
Attachments

cc:      All counsel of record (via electronic mail; w/attachments)